## Geothermal Resources International, Inc. v. Eastern Air Lines, Inc.

*E. Barclay Cole*, for plaintiff.
*Lawrence Hoyle*, for defendant.

TAKIFF, *J.*, September 27, 1979—Before the court is a motion for summary judgment of defendant Eastern Air Lines, Inc. (EAL) on Counts II and III of plaintiff Geothermal Resources International, Inc.'s (GRI) complaint in trespass and assumpsit (subsequently restated in the amended complaint in trespass and assumpsit).

As of December 15, 1969, GRI, then known as Commercial Aircraft Leasing Company (Commercial), had sub-leased to EAL five DC-9-31 aircraft pursuant to written agreements denominated Short Term Aircraft Utilization Contracts (STAUC), sometimes hereafter referred to as the lease.[1] On September 11, 1974, one plane known as Eastern #2 crashed and was completely destroyed. The rights and liabilities between the parties are at issue, having been framed by five counts of GRI's complaint. Counts II and III are the subject of the instant motion for summary judgment.

---

1. The five aircraft (DC-9s) were manufactured by McDonnell Douglas Corporation and acquired by Eastern Air Lines, Inc. as sublessee pursuant to an option agreement, also dated December 15, 1969. The convoluted pattern of agreements, leases and subleases which finally yielded the dramatis personae who are the present actors is sometimes euphoniously described in modern financing jargon as "leverage leasing." Part of that labyrinth is mapped in Exhibit A of the affidavit of George L. Barnes, annexed to plaintiff's supplemental answers to the present motion. The relevance of this observation is to denote the identity of all of the parties who have had dealings with these aircraft and to recognize that they are sophisticated entities who were not shackled by "boiler-plate" lease provisions nor unevenly matched in negotiating postures so as to raise the spectre of inequitable

Count II of the complaint avers entitlement to recover in assumpsit for loss of rental income arising out of EAL's alleged negligent operation in violation of the terms of the STAUC. Count III of the complaint is a claim in trespass for unspecified damages resulting from Eastern's alleged negligent operation of the destroyed aircraft. EAL's motion for summary judgment is premised upon what it contends are the exclusive remedies furnished by the STAUC in the event of total destruction, of which GRI has already availed itself.

---

contract provisions, mandated by one party and supinely accepted by the other, i.e., "a mere contract of adhesion, whereby [one party] simply adheres to a document which he is powerless to alter, having no alternative other than to reject the transaction entirely." Galligan v. Arovitch, 421 Pa. 301, 304, 219 A. 2d 463 (1966).

Systems Capital Corporation, as agent for Capital Management Corporation (further identified as agent for Haddon Leasing Company), purchased the aircraft from McDonnell Douglas for "resale" to Capital Management and also arranged for the lease of the same equipment from Capital Management to Systems Capital's subsidiary, Systems Capital Aircraft. Additionally, Systems Capital Corporation undertook to have Systems Capital Aircraft, in turn, lease the aircraft to Eastern Air Lines, Inc. under a Short Term Aircraft Utilization Contract (STAUC) and Option to Convert to Long Term Sublease.

Out of this emerged a series of documents, those presently most pertinent being a lease agreement from Capital Management Corporation (lessor) to Systems Capital Aircraft, Inc. (lessee) dated "as of December 15, 1969."

Pursuant to assignment from Systems Capital Aircraft, Inc. to Commercial Aircraft Leasing Company, the latter as sublessor entered into a STAUC with Eastern Air Lines, Inc. as sublessee, this sublease agreement also made "as of December 15, 1969" with respect to the aircraft identified as "Eastern #2" which is the subject of the counts of the complaint now under consideration. From the complaint we are informed that Geothermal Resources International, Inc. was formerly known as Commercial Aircraft Leasing Company.

The STAUC is an extensive document which sets forth in detail the rights and obligations of the parties. Especially pertinent to the motion sub judice are the following paragraphs of the STAUC, which obligated EAL to maintain specific insurance coverage and recited the obligation of EAL upon loss or damage to the aircraft:

"7. Loss and Damage: If the Leased Property is lost, destroyed or damaged beyond repair, Sublessee shall so report to Sublessor, and Sublessor shall become entitled to any available proceeds of insurance. . . .

"8. Insurance: Sublessee will provide and maintain: (a) Hull coverage for not less than the Loss Value computed in accordance with Schedule C attached hereto, provided that Hull Insurance policies may be subject to flight deductibles of no more than one percent, and taxi ingestion and ground deductibles of no more than one per cent, of said Loss Value . . ."

Pursuant to paragraph 7, EAL has paid to GRI $3,014,817.97, representing the amount specified in the loss value schedule, less a deduction for rent which had been pre-paid. GRI's entitlement to the entire insurance proceeds, including the amount deducted by EAL, is the subject of Count I of the complaint, and hence not presently the subject of our consideration.

GRI has opposed the motion for summary judgment contending, inter alia, that its remedies are cumulative; that its right to insurance proceeds in no way supplants its common-law remedies for negligence or breach of the lease. GRI asserts further that any contractual limitation of liability for negligence must be spelled out with particularity; absent such express exclusion, it is not precluded from pursuing its common-law recourse.

We are mindful that summary judgment may be granted only when a case is free of doubt and no material issues of fact are unresolved. The record must be viewed in the light most favorable to the non-moving party and all doubts must be resolved against the moving party: Herskovitz v. Vespico, 238 Pa. Superior Ct. 529, 362 A. 2d 394 (1976). The uncontroverted facts are that the aircraft known as Eastern #2 was completely destroyed on September 11, 1974, at which time EAL had not been notified that it was in default on the lease. The affidavits of Charles L. Glass, vice-president and treasurer of EAL, and of George L. Barnes, secretary of GRI, both support this finding. George Barnes avers that GRI gave notice to EAL of its default under the STAUC by letter of March 10, 1975, from R. P. Baldwin, president of GRI. However, it is only relevant that EAL was not notified of default in September, 1974, at the time of the aircraft's destruction, and hence the "default" provision of the lease was not then operative, as will become evident hereinafter.

The lease, which both parties concede was duly executed and governs the relationship between them, contains no ambiguities which would open the door to parol evidence. Because contract interpretation is inherently a matter of law, the issues set forth in Counts II and III and subjects of the instant motion are ripe for summary judgment, which we grant in favor of EAL.

The nature of the relationship between parties to transactions of this kind is defined in general by the law of bailments. A technical bailment consists of: (1) a transfer of possession of personal property without transfer of title; (2) an acceptance of possession by the transferee; and (3) if expressly declared, an obligation on the part of the transferee to

deal with the property in accordance with the terms of the agreement or, in the absence of express agreement, the law will imply the duties and responsibilities: Sum. Pa. Jur., Personal Property Law, §1. Absent an express undertaking, the bailee is liable for losses that are proximately the result of his own negligence. Where a bailment is for mutual benefit, as in a lease or bailment for hire, the bailee is held to the exercise of ordinary care in relation to the subject matter thereof and is responsible for ordinary negligence. The bailee is not liable if the property bailed is injured by accident, or by some other means wholly without his fault. In the absence of some special stipulation, the risk of non-negligent injury to or loss of the property falls on the bailor: 9 Williston on Contracts §1034 (3d ed. 1967); Gardner v. Freystown Mutual Fire Ins. Co., 350 Pa. 1, 37 A. 2d 535 (1944).

A bailee may enlarge his responsibility by contract, even to the extent of making himself absolutely liable for the loss or destruction of the bailed goods. See Loeb v. Ferber, 346 Pa. 348, 30 A. 2d 126 (1943). Where a bailee, by the terms of the bailment contract, expressly undertakes to assume the liability of an insurer, the bailee becomes liable without regard to negligence or fault. Because an insurer's liability is extraordinary, a bailee will not be found to have assumed it, absent clear and explicit language. Thus, a seemingly unconditional agreement to return the bailed property, without more, does not impose this unusual responsibility even though the promise be to "return in good condition" or "in the same condition as when received." Id. at 350. Accord: McCoy v. The Home Insurance Company, 170 Pa. Superior Ct. 38, 84 A. 2d 249 (1951).

The decisional law chronicles numerous conflicts between bailors and bailees in which bailors,

after damage to or destruction of their property, attempt to hold bailees liable over and above their common law liability for negligence. See generally, Annotation, 28 A.L.R. 3d 513. Illustrative of cases where common law duties were extended by contractual undertakings are the following. In J. E. Faltin Motor Transportation, Inc. v. Eazor Express, Inc., 172 F. Supp. 175 (W.D. Pa. 1959), aff'd 273 F. 2d 444 (3d Cir. 1959), the construction of seemingly inconsistent language in a trailer interchange agreement was litigated. One provision of the agreement stated that nothing therein should be construed to increase the legal liability of any party thereto; opposed to that provision was a clause by which the party acquiring the trailer agreed to hold the party furnishing the trailer harmless for any loss or damage. The court construed the latter clause as modifying and controlling the former. In essence, a contract of insurance was recognized, negating the bailee's contention and the common law rule that he should not be liable for non-negligent loss.

In Wamsley Pontiac v. Glassow, 47 D. & C. 2d 337 (1969), an automobile bailment lease which bound the bailee to pay the cost of repair of all damages during the rental period was the subject of a motion for summary judgment. Relying upon the inherent right of parties sui juris to enlarge their rights by contract "without regard to the wisdom or folly thereof," and upon J. E. Faltin, supra, the court also construed the language of the agreement to make the bailee an insurer of the property. In so holding, the court reasoned that otherwise the language of the parties would be meaningless and absurd. Accordingly, the court found that the bailee's liability was fixed by the terms of the contract

under which he agreed to pay a sum equal to the cost of repair of damages to the vehicle, without regard to the negligent or non-negligent cause of such damage.

In Philber Lehigh Company v. Canada Dry Bottling Company, 29 Lehigh 322 (1961), the rental agreement covering a leased truck explicitly obligated the lessee to provide "full insurance coverage." While recognizing that the common law would not impose such a duty on a bailee, the court concluded that the effect of the clear and explicit insurance clause was to make the bailee an insurer.

The lesson of these cases is that (1) the common law rule requires proof of negligence by a bailee before imposing liability for damage to bailed property; (2) the liability of a bailee as an insurer of bailed goods is extraordinary, cannot be implied, and must be clearly and unequivocally expressed; and (3) the bailor's interest lies in attempting to hold the bailee to the standard of absolute liability while the bailee normally seeks to escape liability by showing compliance with the common law standard of care only.

The present case is distinguishable from a substantial body of litigation wherein exculpatory contract provisions have been asserted to totally avoid liability for loss or damage which, perforce, was directed to an avoidance of liability predicated on a claim of negligence as in Dilks v. Flohr Chevrolet, 411 Pa. 425, 192 A. 2d 682 (1963). Cf. Loeb v. Ferber, supra. It is those contracts or agreements which reach for *immunity* from liability which have been labeled as not being "favorites of the law" and hence must be construed strictly: Employers Life Assurance Corp., Ltd. v. Greenville Business Men's Association, 423 Pa. 288, 292, 224

A. 2d 620, 623 (1966). To the contrary, the instant lease agreement (STAUC), far from asserting immunity from liability, explicated a responsibility and undertaking on the part of the bailee-sublessee beyond that imposed by operation of law on one holding property of another in such capacities; in the event of total loss or destruction of the leased property, which was the operational fact upon which the challenged counts of this complaint are predicated, the legal obligation and responsibility of the lessee was tantamount to that of an insurer under a "no fault" responsibility to compensate in a prescribed manner and in accordance with a specified table of values, without regard to liability creating conduct on the part of the lessee causing the loss.

To comprehend and rationally apply the unambiguous language of the agreement dealing with total destruction of the aircraft, within the context of the entire STAUC, we look now at the specifically questioned provisions.

The declared purpose of the Sublease Agreement (STAUC) between Commercial, now GRI, who was an assignee of Systems Capital Aircraft, Inc. (Systems), who was an earlier lessee of the aircraft, and Eastern Air Lines, Inc. as sublessee is to "amend and restate the terms and conditions of the [EAL-Systems] STAUC and to terminate the STAUC so that EAL's use of the aircraft will be governed solely by this agreement" (Paragraph C). We are persuaded nevertheless at least to consider and compare an "earlier" document,[2] brought to our

2. "Earlier" as here used is intended to be descriptive of the apparent sequence in which each of the entities occupied the status of lessor, lessee, sublessor or sublessee; all of these relationships were pursuant to documents dated as of December 15, 1969, as each of the parties moved into the pyramid

attention by plaintiff, whereby its assignor, Systems Capital, acquired its rights to the subject aircraft from Capital Management Corp.

That earlier agreement between Capital Management as lessor and Systems Capital as lessee contained the following provision:

"6. Loss and Damage: If the Leased Property is lost, destroyed or damaged beyond repair, Lessee shall so report to Lessor and promptly pay Lessor the applicable Termination Value computed in accordance with Schedule C attached hereto for which payment Lessee shall be entitled to reimbursement from any available proceeds of insurance. If Lessee is not in default, upon any of such events, the rent shall abate as of the date of such payment. . . ."

Immediately succeeding paragraphs obliged the lessee to provide and maintain:

"7. (a) Hull coverage insurance for (i) during the first three years of the base term, not less than the Termination Value computed in accordance with Schedule C attached hereto, . . . provided that Hull Insurance policies may be subject to flight deductibles of no more than one percent of Termination Value and taxi, ingestion and ground deductibles of no more than one percent of said Termination Value. . . ."

And this aspect of the matter was concluded in the following provision:

---

of this financial structure for the various purposes each sought to achieve. Apparently only EAL ever took possession of the aircraft after manufacture by McDonnell and operated the property as aircraft rather than as the subject of financial and legal arrangements.

"8. Special Insurance Conditions: With respect to the insurance required under the preceding paragraph, Lessee will deliver certificates thereof to Lessor before the commencement of any term of this Lease naming the parties hereto and their assignees as named insureds and as loss payees as their interests may appear. Every policy shall provide for 10 days' notice to all loss payees and insureds of any modification or cancellation of the policy."

Patently borrowing heavily from the predecessor document, the lease between Capital Management Corp. and Systems Capital Aircrft, Inc., assignor to Commercial Aircraft, sublessor, and predecessor in name to plaintiff herein, the sublease (STAUC) to Eastern Air Lines, Inc., also dated as of December 15, 1969, which is the document presently before us for adjudication, contained the following provision:

"7. Loss and Damage: If the Leased Property is lost, destroyed or damaged beyond repair, Sublessee shall so report to Sublessor, and Sublessor shall become entitled to any available proceeds of insurance. If Sublessee is not in default, upon any of such events, the rent shall abate . . .

"8. Insurance: Sublessee will provide and maintain:

(a) Hull coverage for not less than the Loss Value computed in accordance with Schedule C attached hereto, provided that Hull Insurance policies may be subject to flight deductibles of no more than one percent, and taxi, ingestion and ground deductibles of no more than one per cent, of said Loss Value . . .

"9. Special Insurance Conditions: With respect to the insurance required under the preceding paragraph, Sublessee will deliver certificates thereof to Sublessor before the commencement of

any term of this Sublease naming the parties hereto, Sublessor's Lessor and their assignees as named insureds and as loss payees as their interest may appear. Every policy shall provide for 10 days' notice to all loss payees and named insureds of any material modification or of cancellation of the policy."

It is apparent that except for differences in nomenclature as between "Termination Value" and "Loss Value" in the respective documents and such differences in those calculations as may have been negotiated and/or required by the interests of the various financing parties going up—or down—the pyramid of this leasing arrangement, the substantive thrust and intendment of both documents were identical; in each was set forth a declared value to be paid if the aircraft be "lost, destroyed or damaged beyond repair." To assure the payment of such stipulated value upon the happening of that event, insurance was to be provided and maintained by the lessee, designating in such insurance policies the lessor and their assigns as named insureds and as loss payees.

In our view, such contractual undertakings and obligations were clear, unequivocal and without condition as to fault or negligence on the part of the lessee or anyone else in causing or effecting such loss or destruction. The intendment is obvious; the purpose was to protect and assure the capital positions of the lessors, or their assigns, in the financial hierarchy.

The uniqueness of this litigation is the reversal of roles attempted by the bailor, GRI. Having already accepted the fruits of the insurance provided by EAL, albeit disputing the retention of a portion thereof, it now seeks recovery on a negligence

theory for damage beyond that contractually provided in the event of the destruction of the aircraft, denying the exclusivity of the insured value as full compensation.

EAL's contractual duty to maintain insurance was the equivalent of assuming absolute liability for loss: Loeb v. Ferber, supra. EAL's duties were *expanded* beyond the common law boundaries imposed by implication or operation of law. GRI concedes this expansion of liabilities of Eastern (and corresponding expansion of rights and benefits by GRI) in its memorandum of law:

"Paragraphs 7 and 8 of the STAUC *expand* the scope of Eastern's potential liability in the event of the destruction of Eastern #2 beyond the bases of recovery which would be available to plaintiff in the absence of these provisions. Paragraphs 7 and 8 also set the limits of recovery in an action for enforcement of the rights established under paragraphs 7 and 8." Page 7.

GRI, however, urges that neither paragraph 7 or 8 of the STAUC expressly precludes or limits further recovery in an action by plaintiff to enforce rights cognizable at common law. Such a contention we reject because it conceives of a remainder or a residual of legal rights and remedies beyond the contracted absolute liability. The rights and duties being contractually defined, extension by implication is rejected.

Because we have concluded, as GRI has conceded, that the terms of the STAUC expand the scope of Eastern's potential liability, the cases cited by GRI for the requirements for contractually *exculpating* a party from its own negligence are wholly inapposite. No exculpation or limitation has occurred; rather its very opposite has been effected.

GRI's contention that its additional remedies should be cumulative seeks to collect additional moneys for loss of rental and other unspecified losses. This is contrary to the unambiguous and clearly declared contractual undertaking. The STAUC provided in paragraph 8 that EAL would provide and maintain coverage for not less than the Loss Value computed in accordance with Schedule C attached to the agreement. Schedule C set forth a detailed method of computing losses by multiplying certain percentage factors, corresponding to the quarterly periods commencing from the original delivery date, by the original cost of $4,191,683. Other specified risks were enumerated in paragraph 8, as well, for which insurance was procured and maintained by EAL and the proceeds of which were payable to GRI.

The loss values for which insurance was provided were matters of contract, subject to negotiations by sophisticated enterprises and variously stated during the several levels of lessor-lessee which preceded the present parties, as each of such entities in this collage negotiated their respective participations and returns. No suggestion has been made that the values stated in the present STAUC are anything but the fair value of the aircraft, as freely negotiated on a schedule anticipating age and depreciation. The contract, absent fraud or mistake, governs the legal relationship between the parties. In fact, paragraph C of the STAUC affirms: "The purpose of this Agreement is to amend and restate the terms and conditions of the STAUC so that EAL's use of the Aircraft will be governed *solely* by this Agreement." (Emphasis supplied.)

Where, as here, the contract places a loss value on the bailed property, and imposes an absolute responsibility tantamount to that of an insurer, the

recovery for loss or damages to said property is that provided for in the agreement of the parties as negotiated and recorded.

GRI's objection to the inadequacy of the insurance proceeds is that it is required to pay to its assignor moneys in excess of EAL's insurance proceeds, pursuant to the terms of the agreement under which GRI received the right to sublease the aircraft. Although the sublease which GRI effected with EAL may have contained what it subsequently regarded as an inadequate damages schedule, that agreement, even if improvident on hindsight, is nevertheless controlling.

The authoritativeness of contract provisions designating remedies upon loss in similar factual circumstances have been consistently respected by the courts. Indeed, in J. E. Faltin, supra, the court expressly denied the bailor's request for damages for loss of use, limiting it to the value of the property. The contract had obligated the bailee to repair and restore the trailer to the condition in which it had been received and required the bailee to hold the bailor harmless for any loss or damage. Plaintiff requested additional sums for loss of use and costs of investigation but the court held that the contract imposed the damages recoverable to that specified, i.e., the cost of repairs. No liability for loss of use was expressed by the contract or implied by law.

In Wamsley Pontiac v. Glassow, supra, where the duty to repair was construed as a duty to insure, the sum of damages was measured exactly as specified by contract, that is, the cost of repairs. Similarly, in Overly v. United Parcel Service of Pennsylvania, Inc., 120 Pitts.L.J. 288 (1972), plaintiff, bailor of a $6,700 fur coat which was subsequently lost, was

limited to recover the valuation placed on the coat when she delivered it to the bailee's agent. Accord: United States Fire Insurance Company v. Paramount Fur Service, Inc., 168 Ohio St. 431, 156 N.E. 2d 121 (1959).

Apart from the contract provision specifically requiring payment of insurance proceeds to GRI in the event of total loss or destruction, paragraph 7 of the STAUC, which provided that rent shall abate if the property is destroyed and the sublessee is not in default, clearly evidences that no further damages were contemplated by the parties. No proviso therein delineates rent abatement to loss incurred with or without negligence of the sublessee. The only circumstance in which it was provided that rent should not abate was if EAL were "in default" at the time of the loss. As this issue has been framed by the motion for summary judgment on Count II of the complaint, we now turn to consider that aspect of the matter.

GRI, seeking to negate the thrust of the "no fault" contractual obligation of the lessee, raises the assertion that genuine issues of fact exist, sufficient to defeat the motion for partial summary judgment. Because the damages it seeks in both Counts II and III of the complaint sound in negligence and alleges breaches of the covenants of the lease, in addition to the entitlement to the proceeds derived from insurance, it also claims entitlement to damages such as loss of rental income suffered by reason of the destruction of the aircraft. To ascertain the merit of this contention we therefore address the contractual definition of "Events of Default" as well as the contractual remedies specified by the parties for such events. Again we seek insight

through a pattern of contractual provisions as set forth in the "earlier" Capital-Systems lease and next in the Commercial - EAL STAUC.

In the earlier document, again noting that "earlier" refers to sequence of succession of interests only because all bear date the same day, we find the following:

"13. Events of Default: The following events shall constitute events of default hereunder: (a) Lessee shall fail to make any rent payment within 10 days after the same shall become due; or (b) Lessee *shall fail* to make any other payment *or perform or observe any other covenant, condition or agreement to be performed or observed by it hereunder, and such failure shall continue unremedied for a period of 15 days after written notice thereof by Lessor*; . . . (Emphasis supplied.)

"14. Remedies Upon Default: *Upon the occurrence of an event of default Lessee shall pay to Lessor an amount equal to Termination Value computed in accordance with Schedule C attached hereto.* Upon the occurrence of such an event, Lessor may terminate this Lease and take possession of the Leased Property; provided that Lessor shall, promptly after taking such possession, sell or lease the Leased Property on the best terms available, and apply the net proceeds, after deducting all expenses, including reasonable attorneys' fees, incurred by Lessor in connection with such retaking, sale or leasing, against Lessee's obligations under this paragraph (and Lessee shall remain liable to Lessor for any deficiency), or pay such portion of the net proceeds to Lessee as shall be necessary to reimburse it for the Termination Value, or any part thereof, paid by Lessee to Lessor.

*All of Lessor's remedies hereunder shall be cumulative and in addition to all other remedies afforded to Lessor at law or equity. Lessee shall pay all costs, expenses and attorneys' fees incurred by Lessor in the exercise of any of such remedies.*" (Emphasis supplied.)

Turning next to the subject STAUC, we find the following parallel provisions:

"14. Events of Default: The following events shall constitute events of default hereunder: (a) Sublessee shall fail to make any rent payment within 10 days after the same shall become due; or (b) Sublessee *shall fail to* make any other payment *or perform or observe any other covenant, condition, or agreement to be performed or observed by it hereunder and such failure shall continue unremedied for a period of 15 days after written notice thereof by Sublessor*; provided, however, that if such failure to perform or observe cannot reasonably be remedied within such time, then such period shall be extended to such an extent as shall be necessary to enable Sublessee to remedy such failure through the exercise of due diligence; . . . (Emphasis supplied.)

"15. Remedies Upon Default: Upon any event of default by Sublessee Sublessor may terminate this Agreement and, without liability for damage, take possession of the Leased Property. Upon such termination for default Sublessee shall pay to sublessor an amount equal to Loss Value computed in accordance with Schedule C attached hereto. Within 60 days after such repossession and payment of Loss Value, Sublessor shall either sell or lease the Aircraft on the best terms available, and

reimburse Sublessee out of the proceeds thereof for the Loss Value paid by it after deducting from such proceeds all expenses including reasonable attorney's fees incurred in connection with such retaking, sale or leasing, and Sublessee shall remain liable to Sublessor for any deficiency."

Clearly, the loss or destruction of the aircraft was not contemplated within these definitions of the "events of default," for any such event was subject to the condition that it be and remain unremedied in excess of the notice period for the sublessor's rights to mature.

No allegation has been made by GRI that EAL failed to make a timely rental payment or had become insolvent. Nor has GRI averred that any other covenant, condition or agreement had been breached by EAL and continued unremedied for 15 days after written notice thereof by GRI. The affidavit of EAL's corporate officer, uncontradicted by GRI, asserts that EAL had received no notice of default pursuant to the STAUC from GRI until several months after the crash of Eastern #2. The terms of the contract clearly govern the construction of the term "default," and in the absence of allegations of fraud or mistake, we will not interfere with the expressed intentions of the parties.

What is clearly manifest from a total reading of these provisions with those earlier quoted is that the scheme or plan of this agreement was to provide separate and distinguishable obligations on the part of the sublessee and correlative rights in the sublessor as to the events of total loss or destruction and for those nonterminal events of breach of covenant which, after notice and failure to correct, would be subject to specified remedies.

Even as to the circumstances of uncorrected

events of default, the fundamental thrust of the agreement is clear; the sublessor was principally concerned with safeguarding its capital position, whether denominated "Termination Value" or "Loss Value." To that end, it reserved to itself the extraordinary remedy of retaking possession of the aircraft on the happening of "Events of Default," selling or leasing the aircraft to recover such value, with the lessee remaining liable for any deficiency.

Close reading and comparison of these successive provisions, in addition to revealing remarkable similarity in pattern reflect, if anything, a reduced remedy available to the sublessor in the present STAUC than in its predecessor in the restricted circumstances of the events of default. In the Capital-Systems lease, after describing the sale/lease on repossession upon the occurrence of an "Event of Default," provision was there made that: "All of Lessor's remedies hereunder shall be cumulative and in addition to all other remedies afforded to Lessor at law or equity." The omission of a comparable reservation in the instant STAUC is a conspicuous variant in this carefully drawn instrument. In a transaction of this character, wherein one document so carefully tracks its predecessor through the various levels of succession in interests, such an omission can only be attributed to a conscious deletion. From this we derive further confirmation of our conclusion of a consciously selected plan and prescribed remedies, contractually undertaken, which the present complaint seeks to unilaterally alter and extend.

Because the terms of the STAUC are comprehensive and unambiguous, we conclude that the relief sought in Counts II and III is contractually precluded, and summary judgment in favor of EAL on those counts is therefore granted.